## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re:

CHARLES WILLIAM FORD, JR.,                    Case No. 03-33864-WRS
                                              Chapter 7
     Debtor,

DONALD PRIORI AND INSURE
NOW, INC.,

     Plaintiffs,                              Adv. Pro. No. 04-3011

v.

CHARLES WILLIAM FORD, JR.,

     Defendant.


## MEMORANDUM DECISION


This Adversary Proceeding came before the court for trial on June 23, 2005. The Plaintiffs Donald Priori and Insure Now, Inc., were present by counsel Rick Battaglia and Dwayne L. Brown. Defendant Charles William Ford, Jr., was present in person and by counsel Von G. Memory and William D. Azar. For the reasons set forth below, the Court finds that the indebtedness owed by Ford is not excepted from discharge, (i.e. the debt is discharged). The Court will enter its judgment by way of a separate document.


## I. FACTS


Defendant Charles William Ford, Jr., filed a petition in bankruptcy in this Court pursuant to Chapter 7 of the Bankruptcy Code on December 18, 2003. Ford was granted

a discharge on April 1, 2004.  The Plaintiffs filed a timely complaint to determine whether an indebtedness owed by Ford to Plaintiff Insure Now, Inc., is excepted from the Debtor's discharge pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4) or (a)(6).  (Doc. 1).

Plaintiffs Insure Now and Donald Priori brought suit against Ford in a civil action styled Insure Now., Inc., v. Ford, Case No. CV-2001-136, in the Circuit Court of Bullock County, Alabama.  On October 24, 2003, the Circuit Court entered a money judgment in favor of Insure Now, Inc., in the amount of $253,000, for compensatory damages.  The judgment was not entered in favor of Donald Priori individually.[1]  At issue here is whether the indebtedness owed by Ford to Insure Now is excepted from Ford's discharge in bankruptcy, pursuant to subsections (2), (4) or (6) of § 523(a).

Plaintiff Donald R. Priori (Randy), his late father Donald L. Priori (Don) and Defendant Ford together formed Insure Now, Inc., in 1999.  Insure Now was chartered by the State of Alabama on April 12, 1999.  The late Donald L. Priori had been in the insurance and real estate business in Union Springs, Alabama since 1955.  He had done business as Bullock County Insurance for many years.  Randy Priori had been in business with his father for many years.  The father and son had a number of business interests in and around the Union Springs area.

Defendant Charles William Ford had been involved in the insurance business since 1975 and has a broad experience in the insurance business.  It appears that Ford's experience was concentrated in the insurance industry, while the Prioris had business

---

[1] As Donald Priori was a named Plaintiff in the original complaint but not named in the Circuit Court's judgment, the Court infers that his claims against Ford were dismissed either at trial or at some earlier time. The Court is unable to determine from its record here precisely when that happened.

Case 04-03011    Doc 62    Filed 08/25/05    Entered 08/25/05 09:11:59    Desc Main
Document    Page 2 of 21

interests in a number of fields other than insurance. As a general observation, it appeared that Ford has a deeper knowledge of the insurance industry than does Randy Priori.[2]

Insure Now was created to write casualty insurance for low value dwellings. Ford owned 1/3 of the stock and the Prioris together owned the remaining 2/3. Ford was paid a salary of $75,000 per year and was to devote his energies to furthering the business of Insure Now. In addition, Ford was provided a car and health insurance benefits. The Prioris contributed $150,000 for capital. Copies of Articles of Incorporation and By-laws were offered into evidence. (Plaintiffs' Exhibits 1 and 2). Notably, there was no written employment contract between Ford and Insure Now, nor is there anything in writing which might suggest the parameters of Ford's responsibilities to Insure Now.

Insure Now was an insurance agency. That is, it wrote insurance policies for insurance carriers or reinsurance companies. At some point in 1999, early in the life of Insure Now, it lost its reinsurance company. That is, it no longer had an insurance product to sell. By early 2000, Ford no longer received regular paychecks from Insure Now as it was no longer able to write casualty insurance policies, its only business. The Prioris refused to contribute additional capital and Ford was unable to find another reinsurance company, leaving Insure Now, and Ford, in a precarious financial condition.

Ford and the Prioris communicated on a regular basis during the year 2000, although precisely what was communicated is a matter of some dispute. Ford continued as a nominal employee of Insure Now and continued to receive insurance benefits and his car, although his salary payments became increasingly sporadic during the year 2000. Ford attempted to find another reinsurance carrier so that Insure Now could write

---

[2] Ford testified that he has been in the insurance business since 1975 and has worked as an underwriter, an agent, and as an insurance company employee.

insurance policies, but was ultimately unsuccessful.  In the meantime, Ford pursued other opportunities.

One opportunity of note came about through a contact of Ford's named Martha Acker.  Ford assisted Acker in an effort to form an insurance company, as opposed to an insurance agency, to write liability insurance for nursing homes.  Ford put Acker in touch with Omar Cordial, who went to work on forming a captive insurance company to write liability insurance for nursing homes.  Cordial and Ford attempted to involve the Prioris on at least two different occasions.  On one occasion, the Prioris were asked to invest $500,000 to provide the capital for the company.  They declined that proposition.  On another occasion, they were asked to employ Cordial at a salary of $250,000 per year. That offer was also declined.

Ultimately, Cordial managed to capitalize the insurance company with capital contributed by the nursing homes which were to be insured.  Ford was paid fees for services rendered on behalf of the nursing home venture while he was still technically in the employ of Insure Now.  Moreover, Ford used office space at Insure Now while he was pursuing his other interests.  In November of the year 2000, Randy Priori learned of the fees paid to Ford and promptly terminated his employment at Insure Now.

From Ford's point of view, Insure Now and the Prioris were not entitled to any part of the fees paid for the nursing home business as they made no contribution to the effort.  Insure Now had nothing to do with providing liability insurance for nursing homes and the Prioris individually did not make any tangible contribution to the nursing home insurance venture.  From Randy Priori's point of view, Ford was a salaried employee of Insure Now and remuneration earned as a result of his insurance related

4

activities should have inured to the benefit of Insure Now, even if Ford was not receiving regular salary payments. The question of whether the fees paid to Ford were his own or the property of Insure Now was decided by the Circuit Court in Bullock County in favor of Insure Now. Having heard the testimony of Randy Priori and Ford, the Court finds that no misrepresentations of fact were made nor was there any intentional suppression of material fact.

While the jury in Bullock County ultimately decided the question of entitlement to the fees in question against Ford, his belief that the fees were his, rather than the property of Insure Now, was reasonable in light of the attendant facts and circumstances. Randy Priori knew that Ford was not being paid a salary and that he was pursuing other opportunities. The Prioris were deriving income from other business interests–money that was not shared with Ford. It was not unreasonable for Ford to surmise that he also could derive income from other business opportunities, without sharing that money with Insure Now and ultimately Don and Randy Priori. The Plaintiffs introduced evidence to show that the check paid to Ford was sent to his in-laws in another city to somehow avoid detection by the Prioris. As the Prioris would have no way of knowing about mail addressed to Ford at his home in Union Springs, there would be no incentive to have a check sent to his in-laws. The Plaintiffs' contention, that this somehow shows consciousness of guilt is without merit. For this reason, the Plaintiffs' claim that these facts were fraudulently suppressed is rejected. The Plaintiffs further contend, in the alternative, that Ford has committed a fraud or defalcation while acting in a fiduciary capacity, citing the fact that Ford was an officer of Insure Now. However, the evidence did not establish that there had been either an express or technical trust.

The Plaintiffs' final contention is that Ford, willfully and maliciously, caused injury to the property of Insure Now. However, as discussed above, he had a good faith belief that the property in question was his. The evidence does not establish that there was anything malicious or willful in Ford's conduct.

## II.  CONCLUSIONS OF LAW

### A.  Collateral Estoppel and Res Judicata

Before addressing the merits of the Plaintiffs' claims pursuant to 11 U.S.C. § 523(a)(2)(A)(actual fraud), (a)(4)(fraud or defalcation while acting in a fiduciary capacity), and (a)(6)(willful and malicious injury by debtor to person or property of another)[3], it is necessary to first address their claims that the state court judgment rendered by the Circuit Court of Bullock County has a preclusive effect upon the dischargeability action now before the Court.[4]  The Court briefly discussed and rejected this argument in its Memorandum Decision dated February 7, 2005, denying the Plaintiffs' second motion for summary judgment.  (Docs. 39, 42, 43, 44).  For purposes

---

[3] Upon review of the briefs filed with the Court, the Plaintiffs have not explicitly alleged a § 523(a)(6) claim.   In their original complaint filed on February 20, 2004, the Plaintiffs assert that the complaint was brought pursuant to § 523(a)(2)(A) and (a)(4).  (Doc. 1).  The Plaintiffs subsequently filed an amended complaint which asserted three different counts: Count One is for Breach of Fiduciary Duty; Count Two is for Suppression of Material Facts; and Count Three is for Conversion.  Although a specific code provision is not mentioned anywhere in this amended complaint, the Court will interpret these three counts as actions brought pursuant to § 523(a)(2)(A), (a)(4), and (a)(6).

[4] Unless indicated otherwise, all references to Code Sections in this Memorandum Decision are to the United States Bankruptcy Code, Title 11, U.C.S. § 101 et seq.

of further clarifying and explaining the Court's views on this issue, the Court will revisit

the Plaintiffs' argument that the state court judgment should be given preclusive effect.

First, in dealing with the issue of res judicata (claim preclusion), it is axiomatic

that such doctrine is not applicable in dischargeability proceedings.  See Chapman v.

Tracey (In re Tracey), 250 B.R. 468, 470-471 (Bankr. D.N.H. 2000); Harris v. George (In

re George), 205 B.R. 679, 681 (Bankr. D. Conn. 1997). Cf. Rosenbaum v. Cummings,

150 B.R. 994, 996 (E.D. Tenn. 1993)(explaining that the doctrine of res judicata applies

in the context of § 523(a)(5) claims because bankruptcy courts and state courts both have

jurisdiction to determine whether a debt is excepted from discharge).  This is so because

"such action is being raised for the first time in bankruptcy court."  Id. at 471.  Indeed,

what was determined at the state court level was the amount of the debt and to whom it is

owed.  However, this Court has been called upon to perform a different task—to

determine whether such debt is entitled to be discharged in accordance with the

provisions of the Bankruptcy Code.[5]

Turning to the issue of collateral estoppel (issue preclusion), it has been made

clear by the United States Supreme Court that such principles are applicable to

---

[5] In support of their argument that the state court judgment is to be given preclusive effect, the Plaintiffs
cite to the case of Brown v. Felsen, 442 U.S. 127, 99 S. Ct. 2205, 60 L. Ed. 2d 767 (1979).  Decided under
§ 17 of the former Bankruptcy Act which preceded § 523 of the Code, the Brown Decision addressed the
question of whether a bankruptcy court is confined to review the record of a stipulation rendered by a state
court when determining the dischargeability of a debt.  The Brown Court flatly rejected the application of
res judicata by stating the follwing:

> [i]n sum, we reject respondent's contention that res judicata applies here and *we hold that the
> bankruptcy court is not confined to a review of the judgment and record in the prior state-court
> proceedings when considering the dischargeability of respondent's debt.*  Adopting the rule
> respondent urges would take § 17 issues out of bankruptcy courts well suited to adjudicate them,
> and force those issues onto state courts concerned with other matters, all for the sake of a repose
> the bankrupt has long since abandoned.  This we decline to do.  (Emphasis added).

Brown v. Felsen, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979).  In light of the reasoning espoused
in Brown, it is difficult for the Court to see how this decision bodes in favor of the Plaintiffs' position.

dischargeability proceedings.[6] See Grogan v. Garner, 498 U.S. 279, 285, n. 11, 111 S.Ct. 654, 658 n. 11, 112 L.Ed. 2d 755 (1991); see also St. Laurent v. Ambrose (In re St. Laurent), 991 F.2d 672, 675 (11th Cir. 1993); Bush v. Balfour Beatty Bahamas, 62 F.3d 1319, 1322 (11th Cir. 1995); SEC v. Bilzerian (In re Bilzerian), 153 F.3d 1278, 1281 (11th Cir. 1998); Hoskins v. Yanks (In re Yanks), 931 F.2d 42, 43 (11th Cir. 1991). The collateral estoppel law of the state issuing the prior judgment controls. St. Laurent v. Ambrose (In re St. Laurent), 991 F.2d 672, 675-676. Under Alabama law, collateral estoppel requires: (1) an issue identical to the one litigated in the prior suit; (2) that the issue have been actually litigated in the prior suit; (3) that the resolution of that issue have been necessary to the prior judgment; and (4) the parties must have been the same in both suits. Parker v. Jefferson County, 796 So. 2d 1071, 1072 (Ala. 2000) (citations omitted).

The Court holds that the principles of collateral estoppel are not applicable here because the state court jury issued a general verdict and upon review of the sparse state court record entered into evidence, it is impossible to determine which count, among the three that went to the jury, Defendant Ford was found liable. The Plaintiffs' filed an amended complaint in the Circuit Court of Bullock County, Alabama, alleging three counts: (1) Breach of Fiduciary Duty; (2) Suppression of Material Facts; and (3) Conversion.[7] (Doc. 43). The Plaintiffs obtained a substantial money judgment against Defendant Ford. Two separate judgments[8] were entered by the Circuit Court in October

---

[6] Res judicata bars all claims that were or might have been presented, whereas collateral estoppel bars only issues actually litigated. Sly v. United States (In re Sly), 280 B.R. 261, 267 (Bankr. N.D. Fla. 2002) (quoting Federal Ins. Co. v. Gilson (In re Gilson), 250 B.R. 226, 233 (Bankr. E.D. Va. 2000)).

[7] A Count for Conspiracy to Defraud was apparently dismissed at a pre-trial conference according to a notation on the amended complaint filed with the Court. (Doc. 43).

[8] The other Order issued by the Circuit Court related to the jury's findings as to Ford's counterclaim against the Plaintiffs, in which the jury found in favor of the Plaintiffs. That Order stated, in relevant part, "we, the Jury, find in favor of the Counter-Defendant, the estate of Donald L. Priori and Donald R. Priori on the

24, 2003. One Order states, in relevant part, that "we, the Jury, find in favor of the Plaintiff Insure Now and against Defendant Charles William Ford, Jr., and assess damages as follows: 'Compensatory Damages: $253, 000.'" (Doc. 39, Exhibit 4). The problem here is that the Court cannot determine with certainty what the jury in the Circuit Court actually decided. There is nothing more than a general finding of liability with a monetary assessment of $253,000.00. The Court does not have before it any certified transcripts or the jury instructions in the underlying state court action in order to help facilitate a better understanding of what was actually decided in the prior litigation where multiple counts went to the jury. The Plaintiffs put forward the curious argument that in the case of a general verdict being rendered, it should be determined that the jury has found on all counts unless a specific count has been identified as a basis for the judgment. This argument cannot prevail for the reason that it is possible for inconsistent counts to go to a jury. The Court views that presuming a jury finding on all counts unless stated otherwise in the instances of a general verdict, would lead to precarious and unworkable results. Furthermore, Courts that have considered this issue agree that where it is unclear as to which grounds a jury relied upon, such judgments generally will not have preclusive effect. See St. Laurent v. Ambrose (In re St. Laurent), 991 F.2d 672, 676 (holding that if a "judgment fails to distinguish as to which of two or more independently adequate grounds is the one relied upon, it is impossible to determine with certainty what issues were in fact adjudicated…"); S.E.L. Maduro (Florida), Inc. v. M/V Antonia De Gastenata, 833 F.2d 1477, 1483 (11th Cir. 1987)(stating that "[i]f the jury could have premised its verdict on one or more of several issues, then collateral estoppel does not act

---

following claims made by Charles William Ford., Jr.: 'suppression,' 'breach of implied contract,' and 'negligence.'" (Doc. 39, Exhibit 5).

as a bar to future litigation of the issues"); <u>Dimmitt & Owens Fin., Inc. v. Green (In re</u>

<u>Green)</u>, 262 B.R. 557, 564 (Bankr. M.D. Fla. 2001)(Court could not conclude that

allegations regarding fraud were "critical and necessary" part of judgment where both

fraud counts and non-fraud counts were asserted in the state court complaint and there

was no way to distinguish which count was the basis for the judgment); <u>see also</u> <u>Wheeler</u>

<u>v. Laudani</u>, 783 F.2d 610, 615 (6th Cir. 1986).

     As the Court cannot determine which count determined the basis for the verdict

rendered in the Circuit Court, the principals of collateral estoppel do not apply.  The

Court will now turn to addressing the merits of the Plaintiffs' dischargeability complaint

pursuant to § 523(a)(2)(A), (a)(4), and (a)(6).

     However, it must first be acknowledged that courts generally favor a policy which

narrowly construes and applies exceptions to discharge.  <u>Equitable Bank v. Miller (In re</u>

<u>Miller)</u>, 39 F.3d 301, 304 (11th Cir. 1994); <u>American Gen. Fin. v. Taylor (In re Taylor)</u>,

187 B.R. 736, 739 (Bankr. N.D. Ala. 1995).  This narrow construction is implemented to

effectuate the central purpose of the Bankruptcy Code, which is to ensure that the "honest

but unfortunate debtor" is provided with a "fresh start."  <u>Grogan v. Garner</u>, 498 U.S. 279,

287.  The burden of proof in a § 523(a) dischargeability proceedings rests upon the

creditor to prove each statutorily prescribed element by preponderance of the evidence.

<u>Id.</u> at 279.


**B.  Section 523(a)(2)(A)**


     Section 523(a)(2)(A) provides as follows:

(a) A discharge under 727 … does not discharge an individual debtor from any debt-

(2) for money, property, services … to the extent obtained, by-

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting a debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).

To prevail under this provision of the Code, the Plaintiff must establish by a preponderance of the evidence that:

(1) The debtor made a false representation of a past or current material fact;

(2) With the intent to deceive the creditor;

(3) The creditor justifiably relied upon the representation;

(4) The creditor sustained loss as a proximate result of the representation.

St. Laurent v. Ambrose (In re St. Laurent), 991 F.2d 672, 676 (11th Cir. 1993); Houston v. Capps (In re Capps), 193 B.R. 955, 959 (Bankr. N.D. Ala. 1995); Checkcare Sys. v. Alexander (In re Alexander), 212 B.R. 993, 996 (Bankr. M.D. Ala. 1997); Lycan v. Walters, 904 F.Supp. 884, 897 (S.D. Ind. 1995); McMullen v. Klaiman (In re Klaiman), 202 B.R. 813, 816 (Bankr. D. Conn. 1996); see Grogan v. Garner, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (preponderance of the evidence is the proper standard for proceedings under Section 523).

The Plaintiffs main contention[9] in support of their § 523(a)(2)(A) claim is that Ford suppressed money from the nursing home insurance program which, according to

---

[9] Randy Priori also contends that he and his father introduced Ford to an individual named Ben Main who informed Ford about an insurance opportunity in the nursing home industry. However, the evidence adduced at trial did not show that this business opportunity had anything to do with setting up a captive insurance company for nursing homes. In addition, Randy Priori admitted that prior to being informed by Ford of the captive insurance company, he had never heard of Martha Acker or Omar Cordial, the two people who were instrumental in setting up the nursing home insurance program.

them, should have been considered revenue for Insure Now. (Doc. 60). The Plaintiffs further allege that Ford and an individual named Omar Cordial devised a plan to develop the nursing home insurance program without including Insure Now. (Doc. 60). In further support of this contention, the Plaintiffs assert that Ford and Omar Cordial developed a company called CSI International, which was set up for purposes of receiving commission checks from the nursing home program. (Doc. 60). More specifically, the Plaintiffs list a variety of facts which they allege were not disclosed to them:

a) That Defendant Ford was working with Omar Cordial to develop the nursing home program business for themselves and leaving Insure Now, Inc. out of the process and;

b) That the nursing home client had agreed to fund the $1,000,000.00 needed for the Cayman Island captive company and;

c) That there was no capital needed from Insure Now, Inc. to generate the nursing home program commissions and;

d) That the nursing home program had began paying commissions and;

e) That Defendant Ford and Omar Cordial were receiving the nursing home commissions while Insure Now., Inc. was still supplying office equipment, a vehicle, and health insurance to Defendant Ford;

f) That Defendant Ford refused to tell the Plaintiffs the total amount of commissions received on the nursing home program.

(Doc. 60).[10]  The Plaintiffs further assert that they detrimentally relied on Ford's suppression of these various facts as evidenced by the fact that they provided Ford with 1) use of an office at Insure Now; 2) use of Insure Now's computer[11]; 3) payment of health insurance for him and his family; and 4) use of a car provided by Insure Now.

Despite the flurry of contentions put forth by the Plaintiffs, the evidence submitted to the Court and the testimony at trial makes clear that the Prioris were very much aware of the nursing home insurance program that was established by Ford and his contacts in the insurance business.

The evidence reflects that Ford, who had been involved in insurance since 1975, had a broad range of experience in this type of business.  Sometime around February of 1999, Ford and the Prioris conceived the idea to set up an insurance agency, Insure Now, Inc., which wrote casualty insurance for low value dwellings.  Ford was a vice president, a director, and a 1/3 shareholder of Insure Now.  As an employee and shareholder of Insure Now, Ford's salary was set at $75,000 per year.  Sometime in 1999, Insure Now lost its reinsurance company— in other words Insure Now lost all of its revenue.  In January of 2000, Insure Now could not afford to pay Ford his regular salary and Ford began to receive sporadic monthly payments thereafter.  It was agreed that Ford could continue to use a car and receive health benefits provided by Insure Now.  Ford attempted to find another reinsurance company, however these efforts proved to be unsuccessful.

---

[10] See American Surety & Casualty Co., v. Hutchinson (In re Hutchinson), 193 B.R. 61, 64 (Bankr. M.D. Fla. 1996) (holding that a nondisclosure or a false statement made in reckless disregard for the truth can be construed as a misrepresentation).

[11] Ford used the email system of Insure Now to assist in setting up the captive company.  These emails were entered into evidence.  (Defendants' Exhibits 21-41).

It is Ford's position that in light of his agreement to continue to work for Insure Now on a deferred compensation basis, the Prioris encouraged him to look to other business ventures for income.[12]  Such an opportunity arose for Ford through a contact of his named Martha Acker, an employee of Robinson-Adams insurance agency.  Ford testified that he had known and been friends with Acker for over twenty years.  Ford assisted Acker in an effort to form an insurance company, as opposed to an insurance agency such as Insure Now, to write liability insurance for nursing homes.  Sometime around April of 2000, Ford referred Martha Acker to Omar Codial for purposes of setting up a captive insurance company to write liability insurance for nursing homes.  At this point in the development of the nursing home program, Ford not only informed the Prioris about this new venture, but aggressively attempted to include Insure Now into sharing in this new business venture.  After Cordial and Acker decided to go forward with the idea of forming a captive company, Ford testified that he spoke with the Prioris sometime around May of 2000 about hiring Cordial, who had the expertise in setting up captive companies, at a salary of $240,000 per year.  There was also testimony that Ford went to the Prioris and encouraged them to invest $500,000 to help set up the captive company.  The Prioris declined asserting that they did not have the financial ability to meet such offers.  Ultimately, Cordial was able to capitalize the insurance company with capital provided by the nursing home client.  While the Prioris point out the fact that Ford himself put up none of his own money and yet has received commissions in an amount in excess of $400,000 for providing assistance to the organization of the captive insurance program, the evidence also reflects that the program was able to transpire solely because

---

[12] After the financial decline of Insure Now, the Prioris presumably were able to draw income from various other family owned businesses, including Bullock County Insurance and Realty.

of Ford's contacts in the insurance business and Omar Cordial's expertise in setting up captive insurance companies. The Prioris, in order to be able to participate in the nursing home program, would have had to  bring something of value to the table— that being money to invest in the captive company for purposes of starting the company and setting up a reserve, or hiring Omar Cordial who had the expertise in this area.  After considerable communications had transpired between Ford and the Prioris and after repeated attempts by Ford to engage Insure Now in the new insurance program, the Prioris simply declined to be involved.  The Court finds that Ford provided ample disclosure to the Prioris about the nursing home program and in fact attempted to involve the Prioris in the venture at various points in its development.

Furthermore, the thrust of the Plaintiffs' contentions in bringing this § 523(a)(2)(A) action against Ford is that he allegedly failed to disclose that he had received funds in the form of commissions or fees from the nursing home program, which they assert were proceeds of Insure Now.[13]  However, Ford contends that the funds received from the nursing home program belonged to him alone, as a finder's fee that Cordial agreed to pay Ford as a result of referring Martha Acker to him.  At trial Ford asserted that he did not inform the Prioris about the commissions he received because the money belonged to him and therefore he felt that he had no obligation to disclose that fact.[14]  The Court finds Ford's testimony in this regard persuasive.  Because Ford had a good faith belief that the money that he had received was his, he could not have harbored

---

[13] There is a factual dispute as to exactly how the Plaintiffs found out about the commissions that Ford received.  It is undisputed that what led to the discovery was a deposit slip found by Randy Priori.

[14] Ford was fired from his position at Insure Now in November of 2000.  To the extent that any of the commissions that Ford received after the date of his firing, it would not appear that Ford would have any duty to disclose receipt of those funds, as all duties to Insure Now would have terminated.

15

an intent to deceive the Plaintiffs in any way.  See <u>Chase Manhattan Bank v. Murphy (In</u> <u>re Murphy</u>), 190 B.R. 327, 332 (Bankr. N.D. Ill. 1995)(fraud implied in law, which may exist absent a finding of bad faith or intentional wrongdoing, is not sufficient to support a claim under Section 523).

In light of hearing the testimony of Ford and Randy Priori at trial, as well as the briefs and memoranda submitted by both parties in this dispute, the Court finds that Ford made no misrepresentations of fact nor did he intentionally suppress any material fact. Furthermore, even if fraudulent intent could be inferred from these facts, the Court finds that the Plaintiffs have failed to prove any detrimental reliance.  The Court notes that the Plaintiffs were providing Ford with such things as health insurance, a car, and email access long before the concept of the nursing home insurance program was underway. Because the Plaintiffs have failed to prove the elements of their § 523(a)(2)(A) claim, Ford's indebtedness to the Plaintiffs is not excepted from discharge pursuant to this provision.

## C.  Section 523(a)(4)

The Plaintiffs argue that, as vice president, a director, and a 1/3 shareholder of the now defunct insurance agency Insure Now, Ford breached his fiduciary duty by fraudulently diverting commission sales received from the nursing home insurance program, for the exclusive benefit of himself.

Section 523(a)(4) excepts from a debtor's discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  The concept of

Case 04-03011    Doc 62    Filed 08/25/05    Entered 08/25/05 09:11:59    Desc Main
Document      Page 16 of 21

"fiduciary" has been interpreted narrowly by federal courts. Following abundant precedent in this area of the law, the Court views the term "fiduciary" for purposes of § 523(a)(4) as requiring the existence of an express or technical trust. See Quaif v. Johnson, 4 F.3d 950, 953 (11th Cir. 1993); Houston v. Houston (In re Capps), 193 B.R. 955, 960 (Bankr. N.D. Ala. 1995); Utica Mut. Ins. Co. v. Johnson (In re Johnson), 203 B.R. 1017, 1021 (Bankr. S.D. Ga. 1997); Posillico v. Bratcher (In re Bratcher), 281 B.R. 753, 762 (Bankr. M.D. Fla. 2002); By definition express or technical trusts excludes trusts implied by law, rather such trusts must be established by contract or statute. Florida Dep't of Ins. V. Blackburn (In re Blackburn), 209 B.R. 4 (Bankr. M.D. Fla. 1997).

Here, the record is clear that an express trust was not created by contract because there was no employment agreement between Ford and Insure Now. While Ford acknowledged that he actually wrote the Articles of Incorporation and By-laws for Insure Now, there is no dispute that there was no written contractual agreement between the parties to speak of regarding their employment relationship. (Plaintiffs Exhibits 1 and 2). Also, there was no express or technical trust created by statute. A review of the pertinent Alabama Code sections, ALA. CODE § 10-2B-8.30 (1975) and § 10-2B-8.42 (1975), reveals only that Alabama law recognizes the existence of fiduciary duties between officers, directors, and shareholders. However, nothing in the aforementioned provisions establish an express or technical trust, which is the type of fiduciary relationship required by § 523(a)(4). See Dominie v. Jones (In re Jones), 306 B.R. 352, 357 (Bankr. N.D. Ala. 2004)(holding that "[a]n officer and controlling shareholder of a closely-held corporation is not a fiduciary of a technical trust such that he is exposed to liability under §

523(a)(4)")[15]; see also Florida Dep't of Ins. V. Blackburn (Blackburn), 209 B.R. 4, 9

(holding that "as a matter of federal law, the fiduciary duties owed to a Florida

corporation by its officer and director under state law are insufficient by themselves to

constitute the "fiduciary capacity" required under Section 523(a)(4) of the Bankruptcy

Code"). Because the Court finds that no express or technical trust was created between

the parties, Ford cannot be considered a "fiduciary" for purpose of § 523(a)(4).

Furthermore one of the characteristics of an express trust is that it arises out of a

manifestation of an intent to create a fiduciary relationship. Houston v. Houston (In re

Capps), 193 B.R. 955, 962.[16] However, the relationship between Ford and Insure Now

---

[15] The Court has also reviewed the provisions of ALA. CODE § 27-7-36 (1975). The Court notes that neither the Plaintiffs nor the Defendants have raised this provision as an issue in this case, however the Court finds that the Plaintiffs could not have prevailed in establishing the requisite fiduciary relationship under § 523(a)(4) by relying on this provision. Section 27-7-36, ALA. CODE (1975), provides the following:

  (a) All premiums, return premiums, or other funds belonging to others received by a producer in transactions under the producer's license shall be trust funds so received by the licensee in a fiduciary capacity, and the licensee in the applicable regular course of business shall account for and pay the same to the insurer, insured, producer, or other person entitled thereto.

  (b) Any producer who, not being lawfully entitled thereto, diverts or appropriates such funds, or any portion thereof, to his or her own use shall, upon conviction, be guilty of theft of property punishable as provided in Article 1, commencing with Section 13A-8-1, of Chapter 8 of Title 13A.

ALA. CODE § 27-7-36 (1975). First, even under a strained analysis characterizing the proceeds from the nursing home program as insurance of premiums of Insure Now, the statute here fails to create a fiduciary relationship for purposes of § 523(a)(4). The Court in Hartford Accident & Indemnity Co. v. McCraney (In re McCraney), 63 B.R. 64, 66-67 (Bankr. N.D. Ala. 1986), addressed this very question. The Court there held that the Alabama statute does not create the type of trust required by § 523(a)(4) because (1) it does not create a trust without reference to the alleged wrongdoing; (2) there are no provisions for a segregated account; (3) the trust res is not defined; and (4) the basic elements of a trust are not present. Id. The Court concurs in this reasoning and finds that Ford could not be considered a "fiduciary" under this Alabama statute.

[16] An express trust exhibits the following characteristics: (1) it is a relationship; (2) it is a relationship of a fiduciary character; (3) it is relationship with respect to property; (4) it involves the existence of equitable duties imposed upon the holder of the title to the property to deal with it for the benefit of another; and (5) it arises as a result of a manifestation of an intent to create the relationship. Houston v. Houston (In re Capps), 193 B.R. 955, 962; see also American Federation of State, County and Municipal Employees v. Boshell (In re Boshell), 108 B.R. 780, 783 (Bankr. N.D. Ala. 1989)(stating that a technical or express trust requires (1) a defalcation of trust; (2) a clearly defined trust res; and (3) an intent to create a trust

was of a diaphanous nature at best. The fact that there was no written employment

agreement underscores the finding that there was no intent by any of the parties involved

to create an express trust. Furthermore, the Plaintiffs have not specifically alleged that

Ford committed "embezzlement" or "larceny" under § 523(a)(4), however even if they

had they could not prevail under these theories because, as previously explained, Ford

lacked the requisite fraudulent intent required by both of these theories. See Ford v.

Pupello (In re Pupello), 281 B.R. 763, 767-768 (Bankr. M.D. Fla. 2002); Financial Store,

Inc. v. Morgan (In re Morgan), No. 03-80369, 2004 Bankr. LEXIS 1167, at *8 (Bankr.

M.D. Ala. Mar. 24, 2004).


## D.  Section 523(a)(6)


Finally, the Defendants allege that Ford has converted actual money that was the

property of Insure Now.  The Court reiterates that the Plaintiffs have not alleged a

specific code section that would support this claim.  However, the Court will nonetheless

analyze this claim as one made pursuant to § 523(a)(6).

Section 523(a)(6) excepts from discharge debts "for willful and malicious injury

by the debtor to another entity or to the property of another entity."  The Supreme Court

has declared that "nondischargeability takes a deliberate or intentional injury, not merely

a deliberate or intentional act that leads to injury."  Kawaauhau v. Geiger, 523 U.S. 57,

61, 140 L.Ed. 2d 90, 118 S.Ct. 974 (1998).  Furthermore, "a wilful and malicious injury

---

relationship) (citation omitted); United Food & Commer. Workers' Union Local 1995 v. Eldridge (In re
Eldridge), 210 B.R. 188 (Bankr. N.D. Ala. 1997).

does not follow as of course from every act of conversion, without reference to the circumstances." <u>Davis v. Aetna Acceptance Co.</u>, 293 U.S. 328, 332, 79 L.Ed. 393, 55 S.Ct. 151 (1934); <u>Miller v. Held (In re Held)</u>, 734 F.2d 628, 630 (stating that "conversion without conscious intent to violate rights of another or under mistake or misapprehension is dischargeable even though debtor acted recklessly")(citation omitted); <u>Southern Concrete Construction Co. v. Lennard</u>, 245 B.R. 428, 433 (Bankr. M.D. Ga. 1999); <u>Shelton v. Steering Fed. Credit Union</u>, 191 B.R. 893, 895 (N.D. Ala. 1995).

The Court finds that Ford did not willfully or maliciously injure Insure Now or property of the Prioris under § 523(a)(6) of the Code. As previously discussed, in light of the fact that Ford had a good faith belief that the money he received was his, the evidence does not support a finding that Ford "willfully" and "maliciously" intended to injure the Plaintiffs as required by § 523(a)(6).

### III. CONCLUSION

Finally, the Court concludes that the debts owed to the Plaintiffs are not excepted from discharge under § 523(a)(2)(A), (a)(4), or (a)(6). The Court finds that as for the Plaintiffs' claim under § 523(a)(2)(A), they failed to show any fraudulent intent on the part of Ford. The Court also finds that their claim under 523(a)(4) fails because there was no express or technical trust, and finally the Court finds that Ford did not intend to cause injury to the Plaintiffs under § 523(a)(6). The Court will enter an Order that is consistent with this Memorandum Decision by way of a separate document.

Done this 24th day of August, 2005.


                                        /s/ William R. Sawyer
                                        United States Bankruptcy Judge


c: Rick A. Battaglia,
   Dwayne L. Brown,
   Attorneys for Plaintiffs
   Von G. Memory,
   William D. Azar,
   Attorneys for Defendant